IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br><br>v.<br><br>SHAUN MARQUS ROBINSON,<br>    Defendant. | NO.   3:21-CR-159-N |

**GOVERNMENT'S OPPOSITION TO MOTION TO DISMISS INDICTMENT**

Shaun Marqus Robison moves to dismiss the indictment, claiming that 18 U.S.C. § 922(g)(1) is unconstitutional—on its face—because it: (1) exceeds Congress's Commerce Clause authority; and (2) violates the Second Amendment. Both arguments fail. The first is foreclosed—as Robinson correctly concedes. So, too, is the second argument. Settled "existing precedent" holds that "criminal prohibitions on felons (violent or nonviolent) possessing firearms [do] not violate" the Second Amendment. *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010). The Supreme Court's decision in *Bruen*[1]—which excluded from its discussion groups, like felons, historically disarmed under the Second Amendment—did not disturb that settled precedent.

Further, even if the issue is now open to debate, the Court should reject Robinson's argument because: (1) felons are not among the "law abiding" citizens protected by the Second Amendment; and (2) *Bruen*'s focus on history and text only

---
[1] *New York Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

confirms that Section 922(g)(1) does not run afoul of the Second Amendment. Robinson's motion should be denied.

**1. Robinson's Commerce Clause argument is foreclosed.**

Robinson acknowledges that his argument under the Commerce Clause is foreclosed and states that he is only raising it to preserve the issue for further review. (Dkt. No. 45 at 5-6.) Because the Fifth Circuit has rejected this exact argument, *see United States v. Alcantar*, 733 F.3d 143, 145-46 (5th Cir. 2013), this Court must reject his invitation to contravene binding precedent, *see Team Contractors, L.L.C. v. Waypoint Nola, L.L.C.*, 976 F.3d 509, 518 (5th Cir. 2020) ("Under this circuit's rule of orderliness, each panel deciding an appeal is bound by Fifth Circuit precedents (*as district courts surely are for other reasons*).") (emphasis added). This Court must therefore deny Robinson relief on this basis.

**2. Section 922(g)(1) does not violate the Second Amendment.**

Robinson's alternative argument—that Section 922(g)(1) violates the Second Amendment—is likewise meritless.[2] (Dkt. No. 45 at 2-5). That argument fails because: (1) it is foreclosed; (2) felons are not among the People protected by the Second Amendment; and (3) this Nation's history confirms that felons can be, consistent with constitutional protections, disarmed.

---

[2] Robinson only attacks Section 922(d)(1) as facially unconstitutional. (Dkt. No. 45 at 2-5.) He has thus waived any argument that Section 922(d)(1) is unconstitutional as applied to him. *See United States v. Barnes*, 953 F.3d 383, 389 (5th Cir. 2020).

### A. Robinson's argument is foreclosed.

Robinson argues that Section 922(g)(1) violates the Second Amendment. The Fifth Circuit has expressly rejected that argument. *Scroggins*, 599 F.3d at 451; *United States v. Darrington*, 351 F.3d 632, 634 (5th Cir. 2003) ("Section 922(g)(1) does not violate the Second Amendment."). In *Scroggins*, for example, the Fifth Circuit explained that, "[p]rior to *Heller*, this circuit had already recognized an individual right to bear arms, and had determined that criminal prohibitions on felons (violent or nonviolent) possessing firearms did not violate that right." *Id.* (discussing *District of Columbia v. Heller*, 554 U.S. 570 (2008).) The Court further explained that "[d]icta in *Heller* states that the opinion should not 'be taken to cast doubt on long-standing prohibitions on possession of firearms by felons.'" *Id.* For those reasons, the Court rejected the argument that Section 922(g)(1) violates the Second Amendment. *Id.*

Robinson mistakenly argues that *Bruen* "upset" Fifth Circuit precedent. (Dkt. No. 45 at 2-3.) As the Fifth Circuit recently recognized, the Supreme Court in *Bruen* (and *Heller*) "exclude[d] from the Court's discussion groups"—like felons—"that have historically been stripped of their Second Amendment rights." *United States v. Rahimi*, 61 F.4th 443, 452 (5th Cir. 2023). "*Bruen*'s reference to 'ordinary, law-abiding citizens' is no different" than *Heller*'s reference to "law-abiding, responsible" citizens. *Id.* Because *Bruen* excluded from its discussion felons' purported rights under the Second Amendment, *see id.*, that opinion cannot be read to upend decades of settled circuit precedent upholding Section 922(g)(1). *See Alcantar*, 733 F.3d at 146 (applying the rule

3

of orderliness and explaining that "an intervening change in the law must be unequivocal, not a mere 'hint' of how the Court might rule in the future").

In fact, to the extent that *Bruen* overcame Fifth Circuit precedent in this area, it was in its application of a means-end scrutiny at the second step of the applicable analysis. *See Bruen*, 142 S. Ct. at 2125-29. Before *Bruen*, some Fifth Circuit cases applied a two-step approach for determining whether a firearm regulation violated the Second Amendment: "the first step [was] to determine whether the challenged law impinges upon a right protected by the Second Amendment—that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee; the second step [was] to determine whether to apply intermediate or strict scrutiny [i.e., means-end scrutiny] to the law, and then determine whether the law survives the proper level of scrutiny." *See, e.g.*, *NRA of Am. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012), *abrogated on other grounds by Bruen*, 142 S. Ct. at 2127-31. Although *Bruen* rejected the second step of that framework, *Bruen*, 142 S. Ct. at 2126-27, it did not significantly alter the first step—assessing whether the relevant regulation "impinges upon a right protected by the Second Amendment." *NRA of Am.*, 700 F.3d at 194; *see Bruen*, 142 S. Ct. at 2129-30 (assessing first whether "the Second Amendment's plain text covers an individual's conduct"). As the *Bruen* Court observed, step one is "broadly consistent" with the text-and-history analysis that the Supreme Court requires. *See Bruen*, 142 S. Ct. at 2127 (observing that "[s]tep one of the [two-step] framework is broadly consistent with Heller, which demands a test rooted in the Second Amendment's text, as informed by history").

The Fifth Circuit's substantial jurisprudence upholding Section 922(g)(1) is not predicated on the kind of means-end scrutiny that *Bruen* rejected. Rather, the analysis was premised on an examination of "the Second Amendment's text, as informed by history"—that is, the "right to bear arms protected by the Second Amendment" as "historically understood." *See Darrington*, 351 F.3d at 634; *see also United States v. Emerson*, 270 F.3d 203, 226 n.21 (5th Cir. 2001) (citing authorities indicating that "Colonial and English societies of the eighteenth century" excluded felons from possessing firearms and that "the Founders" would not have "considered felons within the common law right to arms or intended to confer any such right upon them"), *abrogated on other grounds by Bruen*, 142 S. Ct. at 2127-31. The Fifth Circuit also based its jurisprudence on the Supreme Court's statements in *Heller*, 554 U.S. 570 (2008), indicating that "the central right that the Second Amendment was intended to protect" was "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *NRA of Am.*, 700 F.3d at 193 (discussing *Heller* (emphasis added)), and that "longstanding prohibitions on the possession of firearms by felons" are "presumptively lawful," *Heller*, 554 U.S. 570, 626-27 & n. 26; *see United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009) ("*Heller* provides no basis for reconsidering *Darrington*['s holding that Section 922(g)(1) does not violate the Second Amendment]"). And "*Bruen*'s reference to 'ordinary, law-abiding citizens' is no different." *Rahimi*, 61 F.4th at 452.

For these reasons, *Bruen* did not overturn settled Fifth Circuit precedents holding that Section 922(g)(1) does not violate the Second Amendment. That is why other courts

in this District have rejected the argument as foreclosed. *See United States v. Stewart*, No. 4:23-cr-0105-P, 2023 WL 331353 at *2 (N.D. Tex. May 8, 2023) (holding that *Bruen* "did not change [the Fifth Circuit's] fundamental premise" that "restrictions prohibiting convicted felons from possessing firearms do not violate the Second Amendment"); *United States v. Mosely*, No. 4:23-cv-0041-P, 2023 WL 2777473 at *2 (N.D. Tex. Apr. 4, 2023) (same); *United States v. Daniels*, No. 1:22-cr-024-H, Dkt. No. 85 at 13 (N.D. Tex. May 16, 2023) (concluding that "Fifth Circuit precedent expressly forecloses [the defendant's] attacks on the constitutionality of Section 922(g)(1)" even after *Bruen*). This Court should do the same.

    **B.    Felons, like Robinson, are not among the People protected by the Second Amendment.**

Even if this Court considers the issue anew, it should reject Robinson's argument because felons do not fall within "the people" protected by the Second Amendment, a term that *Heller* said refers to "members of the political community." *Heller*, 554 U.S. at 580; *see also Rahimi*, 61 F.4th at 452 (explaining that "*Bruen*'s reference to 'ordinary, law-abiding citizens is no different'"). As the Fifth Circuit explained in *Rahimi*, felons are a group who "have historically been stripped of their Second Amendment rights," and "whose disarmament the Founders 'presumptively' tolerated or would have tolerated." *Rahimi*, 61 F.4th at 452. Thus, felons fall outside "the overarching class of 'law-abiding, responsible citizens' covered by the Second Amendment." *Id.* at 452 n.6. Therefore, this Court must reject Robinson's argument that Section 922(g)(1) violates felons' Second Amendment rights.

Robinson's rejoinder is unpersuasive. He claims in conclusory fashion that "[a]fter conviction, ex-felons are restored to the rights of citizenship and retain their plaice among 'the people' who entitled to the protections" of the Second Amendment. (Dkt. No. 45 at 3-4.) But *Heller* and *Bruen* do not so hold, and *Rahimi* states the very opposite. Robinson's motion does not even cite *Rahimi*, let alone explain why the Fifth Circuit was wrong to conclude there that felons fall outside of "the people" protected by the Second Amendment. *See Rahimi*, 61 F.4th at 452 n.6. This Court—consistent with *Rahimi*—should conclude that felons fall outside "the overarching class of 'law-abiding, responsible citizens' covered by the Second Amendment," *id.*, meaning that Robinson's argument fails.

### C. This Nation's historical tradition confirms that felons can be dispossessed of firearms.

Even if *Bruen* upended settled circuit precedent vis-à-vis Section 922(g)(1) (it did not), and even if felons were among those protected by the Second Amendment (they are not), this Nation's historical tradition confirms that felons can be dispossessed of firearms. Specifically, two types of historical laws support Section 922(g)(1)'s constitutionality: (1) laws authorizing capital punishment and estate forfeiture for felons; and (2) laws disarming those deemed untrustworthy based on lack of adherence to the rule of law.

#### a. Laws authorizing capital punishment and estate forfeiture.

For centuries, felonies have been "the most serious category of crime." *Medina v. Whitaker*, 913 F.3d 152, 155, 158 (D.C. Cir. 2019). In 1769, Blackstone defined a felony

as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded, according to the degree of guilt." 4 William Blackstone, *Commentaries on the Laws of England* 95 (1st ed. 1769). Blackstone observed that "[t]he idea of felony is so generally connected with that of capital punishment, that we find it hard to separate them." *Id.* at 98 (capitalization omitted). Capital punishment and forfeiture of estate were also commonly authorized punishments in the American colonies (and then the states) up to the time of the founding. *Folajtar v. Attorney General of the U.S.*, 980 F.3d 897, 904-05 (3d Cir. 2020). Indeed, the First Congress (which drafted and proposed the Second Amendment) made a variety of felonies punishable by death, including treason, murder on federal land, forging or counterfeiting a public security, and piracy on the high seas. *See* An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112-15 (1790). And many American jurisdictions up through the end of the 1700s authorized forfeiture of a felon's estate. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn.275-276 (2014) (citing statutes).

A few examples demonstrate the severe consequences of committing a felony at the time. In 1788, just three years before the Second Amendment's ratification, New York passed a law providing for the death penalty for crimes such as burglary, robbery, arson, malicious maiming and wounding, and counterfeiting. 2 Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788) at 664-65 (1886). The act established that every person convicted of an offense making the person "liable to suffer death, shall forfeit to the people of this State, all his, or her goods and chattels, and also

all such lands, tenements, or hereditaments" the person possessed "at the time of any such offence committed, or at any time after." *Id.* at 666. For all other felonies, the authorized punishment for "the first offence" was a "fine, imprisonment, or corporal punishment," and the punishment "for any second offense or felony committed after such first conviction" was "death." *Id.* at 665.

Two years earlier, New York had passed a law severely punishing counterfeiting of bills of credit. 2 Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788) at 260-61 (1886). The law said a counterfeiter "shall be guilty of felony, and being thereof convicted, shall forfeit all his or her estate both real and personal to the people of this State, and shall be committed to the bridewell [correction house] of the city of New York for life, and there confined to hard labor." *Id.* at 261. In addition, "to prevent escape," the defendant was to be "branded on the left cheek with the letter C, with a red hot iron." *Id.*

Similarly, in 1777, Virginia adopted a law for the punishment of forgery, which the legislature believed had previously "ha[d] not a punishment sufficiently exemplary annexed thereto." 9 William Waller Hening, Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature 302 (1821). The act stated that anyone convicted of forging, counterfeiting, or presenting for payment a wide range of forged documents "shall be deemed and holden guilty of felony, shall forfeit his whole estate, real and personal, shall receive on his bare back, at the publick whipping post, thirty nine lashes, and shall serve on board some armed vessel in the service of this commonwealth, without wages, for a term not exceeding seven years." *Id.* at 302-03.

Throughout the 1700s, other American colonies punished a variety of crimes with death, estate forfeiture, or both. For example, a 1700 Pennsylvania law provided that any person convicted of "wilfully firing any man's house, warehouse, outhouse, barn or stable, shall forfeit his or her whole estate to the party suffering, and be imprisoned all their lives in the House of Correction at hard labor." 2 Statutes at Large of Pennsylvania from 1682 to 1801 at 12 (1896). A 1705 Pennsylvania law provided that a person convicted of rape "shall forfeit all his estate" if unmarried, and "one-third part thereof" if married, in addition to receiving 31 lashes and imprisonment for "seven years at hard labor." *Id.* at 178. A 1715 Maryland law provided that anyone convicted of "corruptly embezzling, impairing, razing, or altering any will or record" that resulted in injury to another's estate or inheritance "shall forfeit all his goods and chattels, lands and tenements." 1 The Laws of Maryland[,] With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments 79 (1811).

Further, a 1743 Rhode Island law provided that any person convicted of forging or counterfeiting bills of credit "be adjudged guilty of Felony" and "suffer the Pains of Death" and that any person knowingly passing a counterfeit bill be imprisoned, pay double damages, and "forfeit the remaining Part of his Estate (if any he hath) both real and personal, to and for the Use of the Colony." Acts and Laws of The English Colony of Rhode Island and Providence-Plantations in New-England in America 33-34 (1767). And a 1750 Massachusetts law provided that rioters who refused to disperse "shall forfeit all their lands and tenements, goods and chattles [sic]," in addition to receiving 39 lashes

and one year's imprisonment. 3 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 545 (1878).

As the D.C. Circuit has observed, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158. Thus, "tradition and history" show that "those convicted of felonies are not among those entitled to possess arms" under the Second Amendment. *Id.* at 158, 160. Indeed, the Eighth Circuit recently upheld Section 922(g)(1)'s constitutionality because felons are "not law-abiding citizen[s], and history supports the authority of Congress to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society." *United States v. Jackson*, __ F. 4th __, 2023 WL 3769242 at *6 (8th Cir. 2023).

### b. Laws disarming untrustworthy individuals and those outside the political community.

A second category of historical laws also provides an analogy to felon disarmament—laws that "categorically disqualified people from possessing firearms based on a judgment that certain individuals were untrustworthy parties to the nation's social compact." *Range v. Attorney General*, 53 F.4th 262, 266 (3d Cir. 2022) (per curiam), *vacated upon granting of rehearing en banc*, 2023 WL 118469 (Jan. 6, 2023). In 1689, the same Parliament that "wr[ote] the 'predecessor to our Second Amendment' into the 1689 English Bill of Rights," *Bruen*, 142 S. Ct. at 2141 (quoting *Heller*, 554 U.S. at 593), also passed an "Act for the better secureing the Government by disarming Papists

11

and reputed Papists." 1 W. & M., Sess. 1, ch. 15, 6 Statutes of the Realm 71.[3] That Act provided that any Catholic who refused to make a declaration renouncing his faith could not possess any "Arms Weapons Gunpowder or Ammunition (other th[a]n such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace . . . for the defence of his House or person)." *Id.* at 72. The required oath "was a gesture of allegiance to the English government and an assurance of conformity to its laws." *Range*, 53 F.4th at 275.

American colonies enacted similar laws. For example, "several colonies enacted complete bans on gun ownership by slaves and Native Americans," based on "alienage or lack of allegiance to the sovereign." *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022) (quotations omitted). And during the French and Indian War, Virginia passed a law disarming Catholics that allowed them to keep their arms if they swore an oath of allegiance to the king. 7 Statutes at Large; Being A Collection of All the Laws of Virginia 35-36 (1820) (1756 law). These laws discriminating based on race or religion are repugnant and would be unconstitutional today for reasons having nothing to do with the Second Amendment, but they nevertheless demonstrate that colonial legislatures "had the power and discretion to use status as a basis for disarmament" even of non-violent groups. *Range*, 53 F.4th at 276 n.18.

---

[3] Though the statutory compilation identifies this as a 1688 act, it was enacted in 1689. *See* 14 Journal of the House of Lords (1685-1691) 208-09 (reflecting enactment on May 11, 1689).

12

During the Revolutionary War, Connecticut passed a law providing that any person who "shall libel or defame" any acts or resolves of the Continental Congress or the Connecticut General Assembly "made for the defence or security of the rights and privileges" of the colonies "shall be disarmed and not allowed to have or keep any arms." Public Records of the Colony of Connecticut 193 (1890) (1775 law). And, at the recommendation of the Continental Congress, *see* 4 Journals of the Continental Congress 205 (1906) (resolution of March 14, 1776), at least six states disarmed the "disaffected" who refused to take an oath of allegiance to those states, *see, e.g.*, 5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 479 (1886) (1776 law); 7 Records of the Colony of Rhode Island and Providence Plantations, in New England 567 (1776 law); 1 The Public Acts of the General Assembly of North Carolina 231 (1804) (1777 law); 9 Statutes at Large; Being A Collection of All the Laws of Virginia 282 (1821) (1777 law); Rutgers, New Jersey Session Laws Online, Acts of the General Assembly of the State of New-Jersey 90 (1777 law); 9 Statutes at Large of Pennsylvania 348 (1779 law). Again, these laws demonstrate that, at the time of the founding, legislatures had the authority to disarm even non-violent people whom they deemed not to be law-abiding and trustworthy. Indeed, as the Fourth Circuit has observed, there is "substantial evidence that the Founders severely limited the right to bear arms, excluding from its protection a broad range of often non-violent individuals and groups deemed 'dangerous.'" *United States v. Pruess*, 703 F.3d 242, 246 n.3 (4th Cir. 2012).

The right to bear arms is analogous to certain civic rights historically subject to forfeiture by individuals convicted of crimes. Felons were generally excluded from service on juries in eighteenth-century America. *See* Brian C. Kalt, *The Exclusion of Felons From Jury Service*, 53 Am. Univ. L. Rev. 65, 179 (2003). They were also generally excluded from voting. "[E]leven state constitutions adopted between 1776 and 1821 prohibited or authorized the legislature to prohibit exercise of the franchise by convicted felons." *Green v. Bd. of Elections of City of N.Y.*, 380 F.2d 445, 450 (2d Cir. 1967). Just as historical laws required persons convicted of felonies to forfeit civic rights, Section 922(g)(1) permissibly imposes a firearms disability "as a legitimate consequence of a felony conviction." *Tyler v. Hillsdale County Sheriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (en banc) (Sutton, J., concurring in most of the judgment).

### c. Comparing these historical statutes to Section 922(g)(1) confirms that it is constitutional.

Both types of historical statutes discussed above demonstrate Section 922(g)(1)'s constitutionality. *Bruen* recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791." *Bruen*, 142 S. Ct. at 2132. *Bruen* identified two relevant metrics for this analogical inquiry: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. Put another way, the "central considerations" are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* (emphasis and quotations omitted).

Under the first metric, Section 922(g)(1) imposes *no* "burden [on] a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133. "[C]onviction of a felony necessarily removes one from the class of 'law-abiding, responsible citizens' for the purposes of the Second Amendment." *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017). Moreover, the burden imposed on the felon's rights is comparable to historical laws disarming the untrustworthy and *less* severe than many historical felony-punishment laws, which often included the death penalty and forfeiture of one's entire estate.

Furthermore, the modern and historical laws are "comparably justified." *Bruen*, 142 S. Ct. at 2133. The historical laws sought to adequately punish felons and deter re-offending, as well as to protect society from the untrustworthy. Section 922(g)(1) serves a more limited but equally justified purpose. It seeks to protect society from gun violence committed by felons, who have previously shown disregard for society's laws and are more likely to reoffend, potentially in dangerous ways.

Robinson contends that Section 922(g)(1) is inconsistent with the nation's history of firearm regulation because it purportedly has no analog prior to the 20th Century. (Dkt. No. 45 at 4.) But his argument misunderstands *Bruen*'s historical inquiry. *Bruen* emphasized that the government need only identify a "historical *analogue*, not a historical *twin*." *Bruen*, 142 S. Ct. at 2133. As explained above, Section 922(g)(1) and the historical laws are "relevantly similar," *id.* at 2132, because they imposed severe consequences on the commission of a felony and authorized legislatures to disarm untrustworthy people. Indeed, the Eighth Circuit found that "[l]egislatures historically

15

prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed" and that "Congress enacted an analogous prohibition in § 922(g)(1) to address modern conditions." *Jackson*, 2023 WL 3769242 at *6.

Moreover, the lack of an identical historical statute does not suggest that the founding generation would have viewed Section 922(g)(1) as violating the Second Amendment. As one district court recently observed, a "list of the laws that *happened to exist* in the founding era is . . . not the same thing as an exhaustive account of what laws would have been theoretically *believed to be permissible* by an individual sharing the original public understanding of the Constitution." *United States v. Kelly*, No. 3:22-CR-37, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022). Founding-era legislatures cannot be presumed to have legislated to the full limits of their constitutional authority. In sum, Section 922(g)(1) is consistent with the Nation's historical tradition of firearm regulation. Therefore, this Court should reject Robinson's argument that Section 922(g)(1) is unconstitutional on its face.

## CONCLUSION

Robinson's motion relies on two arguments that are foreclosed. The motion to dismiss the indictment should be denied.

Respectfully submitted,

LEIGHA SIMONTON
United States Attorney

*/s/ Ryan P. Niedermair*
Ryan P. Niedermair
Assistant United States Attorney
Texas Bar No. 24116828
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone: (214) 659-8725
ryan.niedermair@usdoj.gov

**CERTIFICATE OF SERVICE**

I certify that on June 12, 2023, I electronically filed this response with the clerk of court for the U.S. District Court, Northern District of Texas. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorney of record who has consented in writing to accept this Notice as service of this document by electronic means: **Kambira Jones Morgan**.

*/s/ Ryan P. Niedermair*
Ryan P. Niedermair
Assistant United States Attorney